Nos. 13-16259 and 13-16278
Consolidated Appeals

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

WINDOW ROCK UNIFIED SCHOOL
DISTRICT; et al.,
Plaintiffs – Appellees,
v.
RICHIE NEZ; et al.,
Defendants – Appellants.

---

## MOTION FOR CORRETION ON FILING OPENNING BRIEF

COMES NOW, Appellants, by and through undersigned counsel, hereby submits corrected opening brief. The brief that was filed on October 30, 2013 was a draft copy and was accidently submitted. Attached is the correct brief.

RESPECTFULLY SUBMITTED this 21st day of November 2013.

*The Law Offices of David R. Jordan, P.C.*

*David R. Jordan*
David R. Jordan, Esq.
1995 State Road 602
P.O. Box 840
Gallup, NM 87305-0840
(505) 863-2205
*Attorney for Appellants*

Nos. 13-16259 and 13-16278
Consolidated Appeals

---

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

WINDOW ROCK UNIFIED SCHOOL
DISTRICT; et al.,
Plaintiffs - Appellees,
v.
RICHIE NEZ; et al.,
Defendants - Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
D.C. No. 3:12-cv-08059-PGR

---

**EMPLOYEE APPELLANTS' OPENING BRIEF**

---

David R. Jordan
*The Law Offices of David R. Jordan, P.C.*
1995 State Road 602
P.O. Box 840
Gallup, NM 87305-0840
(505) 863-2205

Attorney for Reeves, Reeves, Brutz, John, Hale, Coonsis and Beall
(the "Employee Appellants")

Table of Contents

Table of Authorities.................................................................................iii

Statement of Jurisdiction ....................................................................2

Statement of the Issue..........................................................................2

Statement of the Case ..........................................................................3

Statement of Facts ...............................................................................3

Summary of Argument .........................................................................4

Argument...............................................................................................5

   I.  The District Court Erred In Not Requiring Exhaustion of Tribal Remedies....5

   II. Arizona Is Subject To Tribal Jurisdiction Because It Enters the Navajo Nation as a Tenant........................................................................................8

      A.  Arizona Waived Jurisdiction Over the Navajo Nation. ...............8

      B.  Navajo Regulatory Power is Recognized By the Treaty of 1868 and Supreme Court Opinions. ....................................................................11

      C.  The Regulation Power of the Navajos Was Not Abrogated In *Montana* or *Nevada.* .........................................................................................13

      D.  The First Tier of the *Montana* Test Is Satisfied in this Case. ...................18

      E.  The Second Tier of the *Montana* Test is Satisfied in this Case. ...............20

Conclusion...........................................................................................20

Certificate of Service..........................................................................21

Certificate of Compliance With Rule 32(a).......................................22

Statement of Oral Argument ..............................................................23

Statement of Related Cases ...............................................................24

## Table of Authorities

**Cases**

*Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir., 1969) ........................16, 17

*Begay v. Roberts*, 167 Ariz. 375, 807 P.2d 1111 (Ariz.Ct.App., 1990) ..................10

*Harkness v. Hyde*, 98 U.S. 476 (1878)........................................................................15

*McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164 (1973).........11, 12

*Minnesota v. United States*, 305 U.S. 382 (1939) ....................................................10

*Montana v. United States*, 450 U.S. 544, 566, 101 S.Ct. 1245, 1267, 67 L.Ed.2d 493 (1981)....................................................................................................................5

*Nevada v Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) ..............11

*Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S.Ct. 2709, 2726, 171 L.Ed.2d 457 (2008) ........................................................................................5

*Utah & Northern R. Co. v. Fisher*, 116 U.S. 28 (1885) ..........................................14

*Williams v. Lee*, 358 U.S. 217 (1959)...........................................................12, 13, 17

*Worcester v. Georgia*, 6 Pet. 515, 561, 8 L.Ed. 483 (1832)...................................14

**Statutes**

25 U.S.C. § 1331 ...........................................................................................................2

25 U.S.C. § 231 ...........................................................................................................10

28 U.S.C. § 1295 ...........................................................................................................2

Act June 20, 1910, c. 310, 36 U.S.Stat. 557, 568-579..................................................8

**Rules**

Ninth Circuit Rule 28-2.5 ..............................................................................................2

Rule 56(d) Fed.R.Civ.P. ................................................................................................7

**Constitutional Provisions**

Ariz. Const. Art. 20, Par. 4 ............................................................................................9

Ariz. Const. Art. 3 .........................................................................................................9

**Treaties**

1828 treaty with the Cherokee Nation.......................................................................14

Shoshonee Treaty of 1868 ...........................................................................................15

Treaty of 1868 ....................................................................................................... passim

## Statement of Jurisdiction

The District Court had jurisdiction over this matter pursuant to 25 U.S.C. § 1331 because this dispute arises out of the Navajo Treaty of 1868. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(2). This is an appeal from a final order of the District Court resolving all issues in the case. Judgment was entered by the District Court on May 22, 2013. Docket #53, Excerpts, p. 1[1]. This appeal was timely filed on June 20, 2013. Docket #57.

## Statement of the Issue

Whether the District Court erred in permanently enjoining Appellants from proceeding with their Labor Commission cases against the Appellee school districts in light of the fact that (1) tribal remedies had not been exhausted; and (2) the Navajo Nation has jurisdiction over state school districts when it enters the Navajo Nation as a tenant and agrees to abide by the laws of the Navajo Nation.

To comply with Ninth Circuit Rule 28-2.5, Appellant states that this issue was raised before the District Court in the Response to Motion for Summary Judgment and Motion Pursuant to Rule 56(f), Fed.R.Civ.P.[2], Docket #34; Excerpts, p. 27. The appeal raises pure issues of law, and the standard of review is *de novo*. *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1093 (9th Cir. 2010).

---

[1] The Employee Appellants join the Excerpts of the Record filed by the Navajo Nation Appellants on 10/25/13.

[2] The motion should have been brought under Federal Rule 56(d).

2

## Statement of the Case

This is an appeal from the final permanent injunction order entered by the District Court. These Appellants, Reeves, Reeves, Brutz, John, Hale, Coonsis and Beall (hereinafter the "Employee Appellants"), are or were employees of the Window Rock Unified School District and Pinon Unified School District (hereinafter the "Appellee School Districts").

The Employee Appellants filed cases within the Navajo Labor Commission claiming violations of the Navajo Preference in Employment Act. The cases proceeded to the discovery phase, and some discovery was conducted. Before discovery was completed, the Appellee School Districts filed an action in Federal District Court for the District of Arizona seeking to enjoin the cases from going forward.

Motions and cross-motions were filed in District Court, and the District Court finally ruled in favor of the Appellee School Districts. This appeal timely followed.

## Statement of Facts

This appeal raises pure issues of fact, with the only key facts being undisputed in the case. Those facts are as follows:

1. The Appellee School Districts entered leases with the Navajo Nation to operate schools. Excerpts, p. 40, 48 and 55.

2. The Employee Appellants filed Navajo Nation Labor Commission Cases against the Appellee School Districts. Excerpts, p. 4.

3. The Labor Commission permitted discovery on the issues of the second tier of the *Montana* test. Excerpts, pp. 68-69.

4. The Appellee School Districts filed the federal action seeking to enjoin the Labor Commission cases asserting that the Navajo Nation lacked jurisdiction over them. Excerpts, p. 72.

## Summary of Argument

The District Court should have required exhaustion of tribal remedies before considering the matter. Once the matter properly came to the District Court, it should have refused to enter the injunction because the Navajo Nation has jurisdiction over state school districts that enter the Navajo Nation as tenants. Jurisdiction arises out of the fact that Arizona disclaimed jurisdiction over Navajo lands as a condition of statehood; the Appellee School Districts came on the Navajo Nation as tenants; the Appellee School Districts agreed to abide by Navajo law as a condition of the leases; and the *Montana* test is satisfied because there is a consensual relationship and the economic security of the tribe was in jeopardy.

## Argument

### I.  The District Court Erred In Not Requiring Exhaustion of Tribal Remedies.

This case came to the District Court on an incomplete record from the Navajo Nation Labor Commission. The Employee Appellants were in the midst of discovery before that body when this federal action was initiated. In connection with those discovery efforts, the Employee Appellants had obtained informal discovery from the Navajo Nation on the legislative history of the Navajo Preference in Employment Act and had take the deposition of Peter MacDonald, former Chairman of the Navajo Nation.

The purpose of this discovery was to develop the record under the second tier of the *Montana* test. Under *Montana*, a party may demonstrate the power of an Indian Tribe to regulate where there is "some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana v. United States*, 450 U.S. 544, 566, 101 S.Ct. 1245, 1267, 67 L.Ed.2d 493 (1981). The non-Indian's conduct must not only injure the tribe, "it must 'imperil the subsistence' of the tribal community." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S.Ct. 2709, 2726, 171 L.Ed.2d 457 (2008). Navajo unemployment has ranged from fifty to ninety percent, depending on the area. By comparison, American unemployment during the Great Depression never exceeded twenty-five percent.

5

In *Plains*, the Supreme Court directed lower courts to inquire whether the threat to be regulated by the Tribe imperils the subsistence of the Tribal Community. It is hard to imagine a greater economic peril than unemployment that reaches nine out of ten persons in a given area. The Employee Appellants asked the District Court to permit them to complete their discovery so that they could establish, to the Navajo tribunals and, ultimately, to federal courts, that the economic perils suffered by the Navajos are very real, and necessitated the provisions of the Navajo Preference in Employment Act at issue in this dispute.

Moreover, the Employee Appellants desire to complete their discovery *in the Navajo Labor Commission*. The only justification that the Appellee School Districts have offered for pulling these cases out of the Navajo tribunals is the idea that there is absolutely no merit to the assertion of either of the *Montana* exceptions by the employees of the public schools at issue in this case. This is false. If the second tier of the *Montana* exception is to have any meaning at all, it would certainly apply to a case like the present action where the economic suffering of the Indian Tribe at issue was catastrophic.

The Employee Appellants requested that the District Court allow them to complete discovery in the Navajo Labor Commission. To complete the record before the Navajo Labor Commission, two more depositions are needed. First, the Employee Appellants desire to depose Peterson Zah. Mr. Zah was Chairman after

6

Mr. MacDonald, and he was the leader of the Navajo People when the N.P.E.A. was adopted. Second, the Employee Appellants desire to depose a member of the Navajo Council who was present for the passage of this statute. Once these two depositions are completed, it is anticipated that the parties will be ready for a hearing. At these depositions, the witnesses will be examined as to the specific economic conditions that existed on the Navajo Nation during these relevant time periods. Further, they will be asked how the actual provisions of the N.P.E.A. were designed to address these devastating conditions.

The Employee Appellants also moved that the District Court, under Rule 56(d) Fed.R.Civ.P., permit them to complete this discovery in the federal action prior to the consideration of the summary judgment motion. The District Court erred in rendering a ruling on the second tier of the *Montana* exceptions without first allowing the Employee Appellants to complete the record on the threat to the economic security of the tribe.

The District Court erred in not requiring exhaustion, and it should be reversed by this Court.

## II.   Arizona Is Subject To Tribal Jurisdiction Because It Enters the Navajo Nation as a Tenant.

If this Court does not require exhaustion, it should nevertheless reverse because the District Court reached the wrong conclusion on the issue of jurisdiction.

### A. Arizona Waived Jurisdiction Over the Navajo Nation.

The State of Arizona does not exercise sovereign power over the Navajo Nation. It does not have the power to condemn land for a school, so it was required to enter the Navajo Nation to request land as a tenant.[3] Arizona has completely waived all jurisdiction over Indian lands within the state. Respondent cannot seriously contend, therefore, that it is operating in Navajo territory pursuant to some "governmental" authority. As a matter of law, it has no such authority.

As a people, the Navajos have retained inherent sovereignty since time immemorial. The Treaty of 1868 established the Navajo reservation. *Forty-two years later*, Congress passed the Enabling Act allowing Arizona to become a state. Act June 20, 1910, c. 310, 36 U.S.Stat. 557, 568-579. Section 20 of the Enabling Act required Arizona, *as a condition of admission to the Union*, to disclaim jurisdiction over the Navajo Nation:

> That the people inhabiting said proposed State do agree and declare that *they forever disclaim all right and title to the unappropriated and*

---

[3] Alternatively, Arizona could have asked Congress to condemn the land.

8

*ungranted public lands* lying within the boundaries thereof and to all lands lying within said boundaries *owned or held by any Indian or Indian tribes*, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished *the same shall be* and remain subject to the disposition and *under the absolute jurisdiction and control of the Congress of the United States*…(emphasis added).

In its constitution, Arizona recognized, as it must, that the U.S. Constitution is the supreme law of the land. Ariz. Const. Art. 3. This would include Arizona's express recognition of Art. VI of the U.S. Constitution, which provides that treaties, such as the Navajo Treaty of 1868, are superior to the Arizona constitution.

As required by the Enabling Act, the Arizona constitution expressly disclaimed the state's jurisdiction over Indian tribes, which would include the Navajo Nation:

The people inhabiting this State do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof and to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that, until the title of such Indian or Indian tribes shall have been extinguished, the same shall be, and remain, subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States.

Ariz. Const., Art. 20, Par. 4.

9

In accordance with this treaty, Arizona's entry into the United States was expressly conditioned on its promise to disclaim any right or title to rights or lands held by Indian tribes in Arizona. *Begay v. Roberts*, 167 Ariz. 375, 379, 807 P.2d 1111, 1115 (App. 1990). The Arizona court further noted in *Begay* that the Navajo Treaty of 1868 "has been consistently interpreted to preclude state court jurisdiction over Navajos living on the reservation." *Id.*

Having completely disclaimed any jurisdiction over Navajo lands, Arizona is powerless to condemn Navajo lands for state schools. This is why Arizona must lease the land from the Navajo Nation, instead of simply taking the land by eminent domain. *See also Minnesota v. United States*, 305 U.S. 382 (1939). Further, Congress has established that Arizona does not have the right to enter upon the Navajo Nation to enforce state compulsory educational attendance laws without the express permission of the Navajo Council. 25 U.S.C. § 231.

If Arizona requires permission of the Navajo Nation Council even to enforce compulsory attendance at its schools, how is it possible that Arizona's laws preempt Navajo laws when it comes to the employment of an enrolled member of the Navajo Nation on leased tribal land? The simple fact is that it does not. Arizona has reached beyond its jurisdiction to enter into a lease on land for which it has expressly waived jurisdiction. Plaintiffs cannot seriously contend that Arizona, and not the Navajo Nation Council, has regulatory power over this tribal land.

10

## B. Navajo Regulatory Power is Recognized By the Treaty of 1868 and Supreme Court Opinions.

Plaintiffs rely upon *Montana* and *Nevada v Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) in attacking the regulation power of the Navajo government. This reliance is misplaced. Federal law directly supports the exercise of Navajo jurisdiction.

### A.   The Supreme Court Has Broadly Interpreted Navajo Jurisdiction.

The analysis begins with the Navajo power to exclude all persons, including state agents, from the reservation under the Treaty of 1868. *See* Article II (providing that no person, with certain exceptions, "shall ever be permitted to pass over, settle upon, or reside in" the reservation). The U.S. Supreme Court has addressed the Navajo Treaty of 1868 on many occasions, and has consistently interpreted the Treaty as giving Navajos regulatory power, including an exemption from the power of the sovereignty of the surrounding states.

In *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), for example, the United States Supreme Court issued a strong ruling enforcing Navajo sovereignty. The Court respected the fact that the policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history, thus state law can "have no role to play within reservation boundaries." 411 U.S. at 168.

11

The U.S. Supreme Court then analyzed the Navajo Treaty of 1868, finding that although the "treaty nowhere explicitly states that the Navajos were to be free from state law or exempt from state taxes ... it cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision. It is thus unsurprising that the Navajo Supreme Court has interpreted the Navajo treaty to preclude extension of state law-including state tax law-to Indians on the Navajo Reservation." 411 U.S. at 174-175. Having so held, the U.S. Supreme Court barred a state tax on reservation Navajos.

Although *McClanahan* involved a state tax, it cannot be ignored that the Court recognized the "exclusive sovereignty of the Navajos" over the reservation lands. Several of the Employee Appellants, like the appellant in *McClanahan*, are Navajos who derive their income wholly from reservation sources. Thus, their "activity is totally within the sphere which the relevant treaty and statutes leave for the federal government and for the Indians themselves." 411 U.S. at 179-180.

Another Navajo/Arizona case, *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), established that Arizona's courts could not exercise jurisdiction over a lawsuit brought by a non-Indian against a reservation Navajo. This case established the critical test for an extension of state authority onto Indian

12

lands: states may not extend their jurisdiction to Indian lands where it would interfere with the right of the Indians to govern themselves. 358 U.S. at 223. No greater interference with the right of the Navajos to govern themselves could be imagined than the facts of the present case. Respondent is asking the Court to prohibit a lawfully enacted statute passed by the Navajo Nation Council from protecting the very Navajo citizenry that the Council desired to protect. Under the Treaty of 1868, and under Supreme Court cases like *Williams*, the Navajos have a right to be governed by their own laws and state law has no force or effect on the Navajo Nation.

### C. The Regulation Power of the Navajos Was Not Abrogated In *Montana* or *Nevada*.

The right of the Navajos to protect employees working on tribal lands was not abrogated by *Montana* or *Nevada*. *Montana* related to whether the Crow Tribe could regulate hunting and fishing by <u>*nonmembers*</u> on <u>*land held in fee simple*</u>. *Nevada* related to whether a state law enforcement official could serve process on tribal land. Neither case deprived the Labor Commission of its jurisdiction over Plaintiffs.

To begin with, neither opinion addressed the rights of the Navajo Nation, the largest tribe of Native Americans, under the Treaty of 1868. Instead, *Nevada* addressed the rights of the 900 members of the Fallon Paiute-Shoshone Tribes of western Nevada. Hicks resided "on the Tribes' reservation of approximately 8,000

13

acres, established by federal statute in 1908, ch. 53, 35 Stat. 85." *Nevada*, 533 U.S.
355-356.

The distinction between this federal statute reservation and the Navajo
Nation treaty reservation makes *Nevada* inapplicable to this case. For example, the
Supreme Court distinguished *Worcester v. Georgia*, 6 Pet. 515, 561, 8 L.Ed. 483
(1832), by recognizing that, unlike the non-treaty status of the *Nevada* reservation,
"[t]he 1828 treaty with the Cherokee Nation ... guaranteed the Indians their lands
would never be subjected to the jurisdiction of any State or Territory." *Nevada*,
533 U.S. at 361, n. 4. The Court then further pointed out that the Navajo Nation
Treaty of 1868 was similar to the Cherokee treaty at issue in *Worcester, Id.*, not the
non-treaty status of the Native Americans in the *Nevada* case.

The important distinction of the Treaty of 1868 was underscored again when
the Court quoted *Utah & Northern R. Co. v. Fisher*, 116 U.S. 28 (1885). The Court
recognized that "[i]t has ... been held that process of [state] courts may run into an
Indian reservation of this kind, where the subject-matter or controversy is
otherwise within their cognizance...". The Court recognized, however, that "the
context makes clear that it meant a reservation *not excluded from the territory of a*

*State by treaty.*" *Nevada*, 533 U.S. 363 in text and at n. 5.[4] The Fallon Paiute-Shoshone Tribes had no such treaty; the Navajos do.

The ultimate conclusion of *Nevada* was narrow: "We conclude today, in accordance with these prior statements, that tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations…" *Nevada*, 533 U.S. at 364. The question of whether a state "executing process" was essential to tribal self-government related to the test set out in the Court's previous *Montana* decision. The court went on to point out that a state may lose its authority on a reservation because of an act of Congress (such as the ratification of a treaty), but with regard to the jurisdiction at issue in *Nevada* there had not been any such act of Congress. *Id.*

---

[4] For this proposition, the Court quoted *Harkness v. Hyde*, 98 U.S. 476 (1878), which involved the Shoshonee Treaty of 1868. That treaty was ratified the same year as and employs almost identical language to the Navajo Treaty of 1868. ("On the 3d of July, 1868, a treaty with the Shoshonee Indians was ratified, by which, among other things, that portion of the country within which service of process on the defendant was made in this case was set apart for their 'absolute and undisturbed use and occupation;' and such other friendly tribes or individual Indians as they might be willing, with the consent of the United States, to admit amongst them; the United States agreeing that no persons except those mentioned, and such officers, agents, and employees of the government as might be authorized to enter upon Indian reservations in discharge of duties enjoined by law, should ever be permitted 'to pass over, settle upon, or reside' in the territory reserved, and the Indians relinquishing their title to any other territory within the United States.") *Harkness*, 98 U.S. at 477-478.

The Court further made it clear that the ruling did not extend to state-tribal agreements, such as the leases between the Navajo Nation and the Plaintiffs.

> Whether contractual relations between State and tribe can expressly or impliedly confer tribal regulatory jurisdiction over nonmembers-- and whether such conferral can be effective to confer adjudicative jurisdiction as well--are questions that may arise in another case, but are not at issue here.

*Nevada*, 533 U.S. at 372. Moreover, the Court specifically limited the ruling to the law enforcement setting:

> We do not say state officers cannot be regulated; we say they cannot be regulated in the performance of their law enforcement duties. Action unrelated to that is potentially subject to tribal control depending on the outcome of a *Montana* analysis.

*Id.*

It is interesting to compare the result in *Nevada* with this Court's decision in *Arizona ex rel. Merrill v. Turtle*, 413 F.2d 683 (9th Cir., 1969). Like *Nevada*, *Turtle* addressed the right of a state law enforcement officer to enter on the reservation to exercise his law enforcement responsibilities. Unlike *Nevada*, however, *Turtle* addressed the relationship specifically between Arizona and the Navajo Nation, the governmental entities at issue in this present case. *Turtle* came to a completely different result than *Nevada* – the Ninth Circuit ruled that Arizona did *not* have the right to come onto the Navajo Nation to exercise its law enforcement powers.

16

The Ninth Circuit engaged in a lengthy discussion of the impact of the

Treaty of 1868. In light of that Treaty, and the long history of the United States

government seeking to strengthen the Navajo government, Arizona could only

force extradition from Navajo land if such extradition would not "infringe on the

right of reservation Indians to make their own laws and be ruled by them." *Turtle*,

413 F.2d at 685, *quoting Williams*, 358 U.S. at 220. The Ninth Circuit concluded:

> In 1956 the Navajo Tribal Council, the tribal legislative body, adopted
> a Resolution providing procedures for Indian extradition. While this
> tribal extradition law by its terms specifically provides for extradition
> only to the states of Arizona, Utah, and New Mexico, it has been
> approved by the Commissioner for Indian Affairs as provided for by
> federal law and is now part of the Navajo Tribal Code. 17 N.T.C.,
> Sections 1841-42. The Tribe has thus codified and does now exercise
> its extradition power. This power cannot now be assumed by or
> shared with the State of Arizona without 'infring(ing) on the right of
> reservation Indians to make their own laws and be ruled by them.'

*Turtle*, 413 F.2d at 686.

Thus, where there is a conflict between Arizona law and Navajo law, it is

Arizona law that yields, not Navajo law.

> In *Montana*, the U.S. Supreme Court dealt with a treaty reservation
> with language similar to the Navajo Treaty of 1868. There was an
> important difference between *Montana* and the present case, however.
> *Montana* dealt with the rights to a riverbed. The Court observed: "But
> because control over the property underlying navigable waters is so
> strongly identified with the sovereign power of government, it will not
> be held that the United States has conveyed such land except because
> of 'some international duty or public exigency.'" *Montana*, 450 U.S.

17

at 552. The treaties at issue in *Montana* "fail[ed] to overcome the established presumption that the beds of navigable waters remain in trust for future States and pass to the new States when they assume sovereignty." 450 U.S. at 553.

Faced with a situation where the treaties "nowhere suggested that Congress intended to grant authority to the Crow Tribe to regulate hunting and fishing by nonmembers on nonmember lands", 450 U.S. at 558, the Supreme Court turned to the issue of the Crow Tribe's inherent sovereignty. It was in discussing the Tribe's inherent sovereignty that the Court fashioned the now-famous two-tiered test:

> Non-Indian hunters and fishermen on non-Indian fee land do not enter any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction. And nothing in this case suggests that such non-Indian hunting and fishing so threaten the Tribe's political or economic security as to justify tribal regulation.

450 U.S. at 566. This test has no applicability if, as in the present case, the right to regulate came directly out of the treaty.

### D. The First Tier of the *Montana* Test Is Satisfied in this Case.

Even if the test was applicable, the leases between Plaintiffs and the Navajo Nation are the very embodiment of a "consensual relationship." Lacking any sovereign power of its own, Arizona came on to tribal lands, entered into consensual relationships in the form of leases, and used the leases to create schools on tribal lands. The Employee Appellants were employed at those schools. This dispute arises out of that employment relationship. Even if this case dealt with the

18

inherent sovereignty of the Navajo Nation, as opposed to its treaty rights, *Montana* would be satisfied.

In particular, the Window Rock Public School District leases with the Navajo Nation contain ***express agreements to abide by Navajo law***. The first lease, No. N00-X-14-20-8399, contains an express agreement by Plaintiff Window Rock that it would "give preference to Navajos" and "abide by all laws, regulations, and ordinances of the Navajo Tribal Council now in force and effect or may be hereafter in force and effect." Excerpts, p. 45. The second lease, No. FD-86-702, contains an express agreement by Plaintiff Window Rock that it would "give preference in employment ... to ... Navajos" and that it would "abide by all laws, regulations, and ordinances of the Navajo Tribal Council now in force and effect or may be hereafter in force and effect." Excerpts, p. 53. This latter obligation existed only so long as Navajo laws did not conflict with Arizona or federal laws. *Id.*[5]

Plaintiffs had an express contractual agreement with the Navajo Nation to obey Navajo preference and all Navajo laws. The first tier of *Montana* is satisfied.

---

[5] Plaintiffs have never explained why a provision requiring just cause for termination or forbidding harassment of employees conflicts with Arizona or federal law.

19

### E. The Second Tier of the *Montana* Test is Satisfied in this Case.

This aspect of the *Montana* test was only partially developed, because the District Court cut off discovery that had been permitted by the Labor Commission. Given the staggering unemployment on the Navajo Nation, the Employee Appellants anticipate that they will be able to show through future discovery that the Navajo Preference in Employment Act is critical in protecting Navajos from a state of absolute economic emergency.

The Navajo Nation has faced crippling unemployment. Through the Navajo preference regulations, and through the creation of ONLR, the Navajos have been able to improve their economic plight. This is precisely the type of economic survival that the second tier of *Montana* was designed to ensure.

As noted, the Court should permit the Labor Commission to complete the record in this case before it reaches the merits of the cause. Plaintiffs seek to circumvent that effort, but they should be rebuffed by this Court. The motion for summary judgment should be denied, and the Navajo Nation's previously filed motion to dismiss should be granted.

### Conclusion

This Court should reverse the District Court with orders to dismiss this case without prejudice until all tribal remedies are exhausted. In the alternative, its

20

should reverse and direct the District Court to dismiss with prejudice because the

Navajo Nation has jurisdiction over the Appellee School Districts.

RESPECTFULLY SUBMITTED this 25th day of October, 2013.

*The Law Offices Of David R. Jordan, P.C.*

/s/ *David R. Jordan*

David R. Jordan
1995 State Road 602
P.O. Box 840
Gallup, New Mexico 87305-0840
Attorney for Certain Appellants

## Certificate of Service

I hereby certify that on October 25, 2013, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system.

Participants in this case who are registered CM/ECF users will be served by

the appellate CM/ECF system.

/s/ *David R. Jordan*

21

## Certificate of Compliance With Rule 32(a)

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[x]    this brief contains 4289 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ]    this brief uses a monospaced typeface and contains <state the number of> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[x]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Macintosh 2011 Version 14.3.8 in Times New Roman Size 14, *or*

[ ]    this brief has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

/s/ David R. Jordan
Attorney for Certain Appellants
Dated: 10/25/13

## Statement of Oral Argument

The Employee Appellants request oral argument.

## Statement of Related Cases

Pursuant to Circuit Rule 28-2.6, the Employee Appellants state that they are

not aware of any related cases pending in this Court.

/s/ *David R. Jordan*

9th Circuit Case Number(s)  | *13 -16259 and 13-14278*

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)  | *11.21.13* | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | *[signature]*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |